*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0281**

In the Matter of the Welfare of the Child of:
E. P., Parent.

**Filed August 8, 2016
Affirmed
Kalitowski, Judge[*]**

Hennepin County District Court
File No. 27-JV-15-3545

Scott Cody, Kyle Kosieracki, Tarshish Cody, PLC, Richfield, Minnesota (for appellant E.P.)

Michael O. Freeman, Hennepin County Attorney, Cory A. Carlson, Assistant County Attorney, Minneapolis, Minnesota (for respondent Hennepin County Human Services and Public Health Department)

Jonathan G. Steinberg, Chrastil and Steinberg, P.L.L.P., Minneapolis, Minnesota (for respondent guardian ad litem)

Mallory Kay Stoll, Blahnik Law Office, Prior Lake, Minnesota (for respondents D.P. and P.P.)

Considered and decided by Bjorkman, Presiding Judge; Kirk, Judge; and Kalitowski, Judge.

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**KALITOWSKI**, Judge

Appellant mother challenges the district court's adjudication of her son as a child in need of protection or services (CHIPS) and the court's denial of her motion for sanctions against respondent department. We affirm.

**FACTS**

Respondent Hennepin County Human Services and Public Health Department (the department) filed a petition in June 2015 alleging that D.P., born in May 2004, qualified as CHIPS under Minn. Stat. § 260C.007, subd. 6(3), (8), (9) (2014). The department alleged that D.P. was being medically abused by being "subject to excessive treatment for minor medical concerns by his mother [appellant E.P.], to the extent that these interventions are considered damaging to [D.P.]" The district court signed an emergency order, and D.P. was removed from E.P.'s custody. E.P. denied the department's allegations.

Before trial, E.P. moved for dismissal of the CHIPS petition and sanctions against the department. E.P. asserted that "it [wa]s abundantly clear that many of the Petition's allegations either ha[d] no evidentiary basis or [we]re simply false" and that "in [the department]'s zeal to protect [D.P.] from suspected abuse, the [d]epartment did a less-than-thorough investigation of the reported facts before filing the Petition." The district court denied E.P.'s motion, stating that the department conducted "a reasonable inquiry under the circumstances," that there were "sufficient facts to support a juvenile protection matter under current law," and that "the issues raised by [E.P.] may be appropriately addressed during trial."

The district court held a three-day trial in January 2016, during which the parties submitted into evidence hundreds of pages of D.P.'s medical records and called several medical professionals as witnesses. The department called as its primary witness Alice Swenson, MD, who had worked as a child-abuse pediatrician for nearly ten years. Dr. Swenson had "conducted nearly a thousand evaluations for suspected child physical abuse, sexual abuse and neglect as well as thousands of evaluations of children for general pediatric care" and had testified as an expert dozens of times. Dr. Swenson testified that "medical child abuse" occurs "when a parent or guardian . . . seek[s] excessive medical care for their child, even to the point of creating symptoms in the child, or report[s] symptoms that are not there to medical providers in order to have interventions performed, and for the child to have the sick role." Dr. Swenson testified that determining whether medical child abuse is occurring involves a "very painstaking[]" review of the child's medical records and "look[ing] at the whole picture and all the medical information."

Dr. Swenson testified that she reviewed all of D.P.'s available records, which encompassed "[t]housands of pages," and spoke to some of D.P.'s medical providers. She stated that D.P. was placed on supplemental oxygen as an infant and remained on oxygen into childhood due to E.P.'s "frequent complaints of him having desaturations"—low levels of oxygen in the blood—"on an oxygen monitor at home." Dr. Swenson asserted that there was no "reason, that [she could] see, from a review of the records, that [D.P.] should be on supplemental oxygen now." She testified that D.P. "ultimately . . . got a tracheostomy, which is a tube directly into his throat, so that his airway could be kept open while he was sleeping" because E.P. "reported that he was failing to tolerate the various

3

more common interventions used [for sleep apnea], including BiPAP or CPAP." Dr. Swenson stated that D.P. "has some mild to moderate obstructive sleep apnea," that he had "[n]umerous" sleep studies that revealed "occasional concerns about mild desaturations" but "no major desaturation[] events," and that it is not common to use a tracheostomy to treat sleep apnea. Dr. Swenson also testified that D.P. used a wheelchair during childhood, that there was "no really clear explanation given" for why D.P. was using a wheelchair, and that D.P. did not have "any diagnoses . . . that would lead him to be placed in a wheelchair."

Based on her review of D.P.'s medical records, Dr. Swenson concluded "[t]hat to a reasonable degree of medical certainty, medical child abuse did occur." She testified that E.P. described symptoms that were not validated by medical providers, misrepresented "possible diagnoses as definitive diagnoses," and took D.P. to numerous medical institutions "seeking opinions that were more in line with what [she] wanted to hear." According to Dr. Swenson, this led to significant medical interventions, "[m]ost notably his being on oxygen and having a tracheostomy," which "appeared to have no relationship to the actual issues that [D.P.] has."

Kenneth Maher, a department child-protection investigator, and Katie Ueland, a department child-protection social worker, testified that, after D.P. was removed from E.P.'s custody, he did not use supplemental oxygen or a wheelchair. D.P.'s uncle, M.P., also testified that D.P. had stopped using supplemental oxygen and a wheelchair and that D.P. was involved in playing lacrosse. Maher testified that doctors determined that D.P. "probably didn't need the tracheostomy" and that the size of the tracheostomy tube was

4

being reduced. Ueland testified that a CHIPS adjudication was appropriate and that ongoing services and court supervision of the family were necessary. Respondent Patricia Timpane, D.P.'s guardian ad litem, testified that she believed D.P. is in need of protection and services due to "what has occurred with him during [his] life."

E.P.'s witnesses included several doctors who had provided care for D.P. John Garcia, MD, testified that he performed several sleep studies on D.P. due to D.P.'s sleep apnea and discussed surgical intervention with E.P. Richard Karlen, MD, performed the tracheostomy surgery and testified that doctors explored "options for [D.P.] in terms of improving his airway" and determined "that it was probably best just to allow [D.P.] to have a very effective and sure airway at night, and the best way to do that is with a tracheotomy tube." David Smeltzer, MD, D.P.'s pediatrician, asserted that he never had "any reason to believe that [E.P.] was falsifying [D.P.]'s symptoms" and that E.P. never "pressured [him] to make a treatment diagnosis or referral."

The district court adjudicated D.P. as CHIPS under Minn. Stat. § 260C.007, subd. 6(3), (8), (9), and transferred legal custody of D.P. to the department. The court found that D.P. was "a victim of medical child abuse perpetrated by [E.P.]" and "ha[d] been subjected to multiple unnecessary medical interventions, and as a result ha[d] suffered significant harm."

**D E C I S I O N**

**I.**

E.P. challenges the district court's adjudication of D.P. as CHIPS. "The district court is vested with broad discretionary powers when deciding juvenile-protection

5

matters." *In re Welfare of Child of S.S.W.*, 767 N.W.2d 723, 733 (Minn. App. 2009) (quotation omitted). "On appeal of a juvenile-protection order, we review the juvenile court's factual findings for clear error and its finding of a statutory basis for the order for abuse of discretion." *In re Welfare of Child of D.L.D.*, 865 N.W.2d 315, 321 (Minn. App. 2015), *review denied* (Minn. July 21, 2015). "A finding is clearly erroneous only if there is no reasonable evidence to support the finding or when an appellate court is left with the definite and firm conviction that a mistake occurred." *Id.* at 322 (quotation omitted). "A district court abuses its discretion if it improperly applies the law." *Id.* (quotation omitted). "Considerable deference is due to the district court's [juvenile-protection] decision because a district court is in a superior position to assess the credibility of witnesses." *S.S.W.*, 767 N.W.2d at 733 (quotation omitted).

If a court finds that a child is in need of protection or services, the court may, among other dispositions, transfer legal custody to the responsible social services agency. Minn. Stat. § 260C.201, subd. 1(a)(2)(ii) (2014). The term "'[c]hild in need of protection or services'" is defined to include a child who "is without necessary food, clothing, shelter, education, or other required care for the child's physical or mental health or morals because the child's parent, guardian, or custodian is unable or unwilling to provide that care"; a child who "is without proper parental care because of the emotional, mental, or physical disability, or state of immaturity of the child's parent, guardian, or other custodian"; and a child whose "behavior, condition, or environment is such as to be injurious or dangerous to the child or others." Minn. Stat. § 260C.007, subd. 6(3), (8), (9).

6

The district court made detailed findings regarding D.P.'s documented medical conditions and necessary medical treatments. The court also made detailed findings regarding several other medical conditions alleged by E.P. and D.P.'s unnecessary medical treatments and interventions. On appeal, E.P. focuses on the findings regarding D.P.'s need for a tracheostomy, supplemental oxygen, and a wheelchair.

Sleep studies conducted in 2012 indicated that D.P.'s sleep apnea was effectively treated with continuous positive airway pressure (CPAP). D.P. switched to using bilevel positive airway pressure (BiPAP) following another sleep study in 2013, and, as of at least February 2014, D.P.'s sleep apnea was considered to be effectively treated with BiPAP. E.P. thereafter began to report that D.P. was experiencing disruptive sleep and was irritable and tired.

D.P. underwent tracheostomy surgery in July 2014 without undergoing an updated sleep study. Dr. Swenson testified: "[T]here were periods where [CPAP or BiPAP] would be considered to be working well, and then [E.P.] would report that [D.P.] wasn't tolerating the masks, or that they weren't for him. . . . And then ultimately he was reported to not be able to tolerate CPAP or BiPAP." According to Dr. Swenson, the tracheostomy surgery resulted from E.P.'s "report[s] that [D.P.] was failing to tolerate the various more common interventions used [for sleep apnea], including BiPAP or CPAP." Dr. Garcia also testified that the decision that "a tracheostomy was required" was based on "clinical symptoms," meaning "symptoms that were related to the doctors by caretakers of [D.P.]" The district court found that E.P. reported symptoms of sleep apnea that were never observed by

medical providers and reported that common treatments for sleep apnea were ineffective, which eventually led to D.P.'s tracheostomy surgery.

D.P. was placed on daytime supplemental oxygen as an infant due to initial difficulty breathing. E.P. continued to assert that supplemental oxygen was needed as D.P. grew older although D.P. was also active in gymnastics at the time, sometimes participating in the activity for up to four hours a day. Some medical providers questioned D.P.'s continued use of supplemental oxygen, noting in medical records, "[D.P.] has a lifelong oxygen requirement, the reason for which is not well understood," and, "It is unclear . . . why [D.P.] needs oxygen, particularly in the daytime as he is quite active and vigorous." Maher testified that E.P. indicated to him "that the use of supplemental oxygen was ongoing" and that D.P. would use oxygen when he "looked tired, . . . if [E.P.] thought that he was having trouble breathing[,] . . . if they were in for a long day of errands, or being out and about."

After D.P. was removed from E.P.'s custody, medical providers determined that D.P. did not need supplemental oxygen. Dr. Swenson testified that there was no "reason, that [she could] see, from a review of the records, that [D.P.] should be on supplemental oxygen now." She defended her conclusion that D.P. does not need supplemental oxygen by stating that "he never had any desaturations while in the hospital," and that "all of the desaturations were reported by [E.P. as] occurring at home." Dr. Swenson asserted that E.P.'s reports of desaturations were fabrications. The district court found that many of D.P.'s symptoms reported by E.P. were never observed by medical providers, including

8

D.P.'s. breathing difficulties, inability to walk long distances, and inability to maintain adequate oxygen saturations.

D.P. began to use a wheelchair at some point during his childhood. E.P. reported to a physical therapist in 2013 that D.P. could "only walk the distance of a long hallway and while he walks at home, he doesn't walk in the community." D.P. was an active participant in gymnastics at the same time, and he later became involved in playing lacrosse. After D.P. was removed from E.P.'s custody, medical providers determined that D.P. did not need a wheelchair. Dr. Swenson testified that there were no "diagnoses that [D.P.] has that would lead him to be placed in a wheelchair." The district court found that, "[a]side from [E.P.]'s reports, there is no documented medical need for a wheelchair" and that E.P. succeeded in having D.P. remain in a wheelchair despite the lack of a need for a wheelchair.

E.P. challenges Dr. Swenson's inferences, opinions, and conclusions in this appeal. But the district court stated that "Dr. Swenson is an expert in the field of medical child abuse" and that she had "reviewed nearly all of [D.P.]'s medical records and was knowledgeable about the facts in this matter." And the court found that Dr. Swenson's testimony was credible "in all respects" and entitled to "significant weight." In addition, the court found that medical professionals that E.P. called as witnesses, including Doctors Garcia, Karlen, and Smeltzer, lacked comprehensive knowledge of D.P.'s medical history and that their testimony was entitled to little weight. The district court was in the "superior position" to assess witness credibility during trial, and we defer to the credibility determinations that the court explained in detail in the CHIPS adjudication order. *S.S.W.*, 767 N.W.2d at 733 (quotation omitted).

9

The district court documented the evidentiary support for its findings and inferences in the CHIPS adjudication order. Based on all of the evidence presented at trial, the court determined that D.P. was "a victim of medical child abuse perpetrated by [E.P.]" and "ha[d] been subjected to multiple unnecessary medical interventions, and as a result ha[d] suffered significant harm." The record contains reasonable evidence to support the court's findings, and those findings support the court's conclusion that D.P. was in need of protection or services. *See id.* at 734 (stating that an appellate court may not reverse a juvenile-protection decision if "the record contains evidence to support the district court's findings of fact, and . . . those findings support the district court's conclusion"). We conclude that the district court did not abuse its broad discretion by adjudicating D.P. as CHIPS under Minn. Stat. § 260C.007, subd. 6(3), (8), (9).

## II.

E.P. challenges the district court's denial of her pretrial motion for sanctions against the department. Whether to impose sanctions is discretionary with the district court. *See Kalenburg v. Klein*, 847 N.W.2d 34, 41 (Minn. App. 2014) (stating that district court award of sanctions is reviewed for abuse of discretion). "A district court abuses its discretion when its decision is based on an erroneous view of the law or is against the facts in the record, or when the district court exercises its discretion in an arbitrary fashion." *Id.*

> By presenting to the court, whether by signing, filing, submitting, or later advocating, a pleading, motion, report, affidavit, or other similar document, an attorney or unrepresented party is certifying to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, that:

(a) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(b) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(c) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(d) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

Minn. R. Juv. Prot. P. 16.02 (mirroring language of Minn. R. Civ. P. 11.02). "If a pleading, motion, affidavit, or other similar document is signed in violation of [Rule 16], the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction . . . ." Minn. R. Juv. Prot. P. 16.04.

E.P. contends that Dr. Swenson's initial report of medical abuse, which led the department to file the CHIPS petition, was based on an incomplete review of D.P.'s medical history and "brimmed with hyperbolic and provably false statements." E.P. further contends that a reasonable investigation by the department would have confirmed Dr. Swenson's errors, but instead the department "took Dr. Swenson's word and ran with it."

The allegations in the CHIPS petition were based on the conclusions of an expert in the field of medical child abuse and that expert's preliminary review of D.P.'s medical records. And, following a three-day trial and the presentation of numerous witnesses and hundreds of pages of exhibits, the district court agreed with the department's allegation

11

that medical abuse had occurred.  Thus, we conclude that the district court did not abuse its discretion by denying E.P.'s motion for sanctions against the department.

**Affirmed.**